**G. H. McSHANE CO., INC., a
corporation, Plaintiff,**

v.

**Warren A. McFADDEN, an
Individual, Defendant.**

Civ. A. No. 74–1046.

United States District Court,
W. D. Pennsylvania.

May 19, 1976.

David L. McClenahan, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for plaintiff.

Edmund K. Trent, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

SNYDER, District Judge.

The Defendant has filed a Motion to Vacate Dismissal of his Counterclaim. The Plaintiff, a Pennsylvania corporation, filed suit in assumpsit on October 1, 1974 in the Court of Common Pleas of Allegheny County to collect a real estate broker's commission and began its action with writs of foreign attachment seizing Defendant's rents from certain property located in the City of Pittsburgh.[1] The Defendant being

---

1. Pennsylvania Rule of Civil Procedure 1252 provides:

"A foreign attachment may be issued to attach property of a defendant not exempt from execution upon any cause of action at law or in equity, other than an action ex delicto arising from acts committed outside the Commonwealth *which is not required to be joined with an action of assumpsit under Rule 1020(d)(1),*

in which the relief sought includes a judgment or decree for the payment of money when

(1) The defendant is an individual who is a nonresident of the Commonwealth, even though he is present in the Commonwealth;

(2) The defendant is a partnership or an unincorporated association without a regular place of business in the Commonwealth and the action is against the defendant in its firm or association name, even though one or more

a resident of Florida, removed the case to Federal Court here, entered a general appearance, and demanded the Plaintiff release the attachment. When the Plaintiff refused to do so, the Defendant filed suit to enjoin continuance of the attachment on the grounds that the Pennsylvania foreign attachment procedure was unconstitutional. Defendant filed an Answer to the Complaint in the foreign attachment proceedings denying the indebtedness and counterclaiming for damages caused by the alleged unlawful attachment which Plaintiff McShane had obtained by use of Pennsylvania's Rules of Civil Procedure.[2]

Upon consolidation of the two actions, the Honorable Wallace S. Gourley of this Court dismissed the McFadden injunction suit and dismissed the McFadden Counterclaim in the matter *sub judice,* holding in both cases that the Pennsylvania foreign attachment procedure was not unconstitutional.

McFadden appealed from the dismissal of the injunction suit and the Court of Appeals vacated the order and remanded the cause for hearing before a Three Judge Court (519 F.2d 1398). After argument on the stipulated record, the Three Judge Court filed an opinion on February 2, 1976, finding Pennsylvania's foreign attachment procedure unconstitutional, and on February 18, 1976, enjoined the attachment of McFadden's rents.

Meanwhile, Plaintiff's claim for the real estate commission had been tried on its merits to the Court and on March 15, 1976, judgment was entered for the Defendant. On March 25, 1976, the Defendant filed the instant Motion to Vacate Dismissal of his Counterclaim setting forth that the Order of Dismissal entered December 2, 1974 did not contain direction for the entry of final judgment under Rule 54(b) of the Federal Rules of Civil Procedure, was therefore not appealable, and was proper for considera-

tion at this time.[3] Defendant's Motion will be denied.

## I. THE PROCEDURAL ASPECT.

Defendant McFadden contends that his Counterclaim was dismissed solely on the ground that Pennsylvania's foreign attachment procedure was not unconstitutional and that that ground has been conclusively held to be incorrect. Initially, the Defendant claimed that the dismissal should be vacated, the Counterclaim reinstated, and the Plaintiff ordered to plead to it. However, counsel has now filed a Stipulation that:

> ". . . the Court may consider and determine the broad question of whether said counterclaim fails to state a claim upon which relief can be granted because it calls for the retroactive application of a new principle of law, rather than limit its consideration to the narrower question of whether the basis for this Court's dismissal of defendant's counterclaim in its Order dated January 31, 1975, was incorrect."

*Fuentes v. Shevin* and its companion, *Parham v. Cortese,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556, *reh. denied* 409 U.S. 902, 93 S.Ct. 180, 34 L.Ed.2d 165 (hereinafter *Fuentes* ), were argued before the Supreme Court on November 9, 1971 and decided on June 12, 1972. In an opinion by Justice Stewart, expressing the views of four members of the Court, the replevin laws of both Florida and Pennsylvania were declared as violative of the Due Process Clause of the Fourteenth Amendment as they denied the right to prior opportunity to be heard before chattels were taken from their possessor, notwithstanding that possession could be regained by posting security bond, and holding that such replevin laws served no such important governmental or general public interest as would justify postponement of the due process right to

members of the partnership or association are present in or are residents of the Commonwealth;

  (3) The defendant is a foreign corporation or similar entity which is not registered in the Commonwealth." (Emphasis added.)

**2.** Foreign attachment is a form of process not a type of action. *Posner v. Sheridan,* 451 Pa. 51, 299 A.2d 309 (1973), quoting Goodrich-Amram.

**3.** Plaintiff does not contend otherwise.

an opportunity for hearing until after the seizure of property. Justices Powell and Rehnquist did not participate in the decision, and Justice White was joined by Chief Justice Burger and Justice Blackmun in dissenting, on the grounds that when the Federal actions were filed, replevin proceedings were in progress in State Court at which time the constitutional objections to the replevin laws could have been raised, there being no allegations in the Federal Courts of bad faith, harassment, or irreparable injury.

Counsel for the Defendant argues on the basis of *Fuentes*, that the Plaintiff in the case *sub judice* seized the Defendant's property two years after *Fuentes* by resorting to a writ even more objectionable than the writ of replevin used in *Fuentes*. He contends the foreign attachment in this case did not afford the Defendant protection of a surety bond and, since Plaintiff resorted to such a writ after *Fuentes*, it did so knowing that the writ of foreign attachment was *a fortiori* unconstitutional since it lacked even the replevin bond requirement. He cites *Higley Hill, Inc. v. Knight*, 360 F.Supp. 203 (D.Mass.1973), where the plaintiffs filed suit in Federal Court to enjoin attachment of their property in the State Court, on the ground that *Fuentes* outlawed the use of the Massachusetts attachment procedure available in the filing of a bill in equity, the attachments having been authorized in advance by the State Court Judge *ex parte*. The Three Judge Court denied plaintiff's motion for a preliminary injunction permitting the question to be considered by the State Court Judge at a new hearing scheduled for the day following that on which the opinion was handed down. With respect to the retroactivity of *Fuentes*, the District Court pointed out that the Supreme Court's opinion gave notice not merely that writs of replevin were illegal, but that all pre-judgment attachments were suspect, saying through Circuit Judge Campbell (at p. 205):

". . . After *Fuentes*, the bar, the legislature and the courts were on notice that the long-established Massachusetts pre-judgment attachments rules were, at very least, suspect. They knew, or should have known, that attachments made without notice and hearing opportunity were governed by principles spelled out in *Fuentes*. Accordingly, state plaintiffs generally can have little complaint if such later attachments are invalidated."

There is, however, a long step to be taken between a process being "suspect" and liability for damages if such suspect process is used. It would serve no useful purpose to recite the rather tortured history of the constitutional attacks upon the writ of foreign attachment which were engaged in unsuccessfully in Pennsylvania for about one hundred and forty years.[4] Suffice it, at

---

4. In 1972 the Third Circuit expressly upheld the constitutionality of the Pennsylvania foreign attachment rules in *Lebowitz v. Forbes Leasing and Finance Corporation*, 456 F.2d 979 (3d Cir. 1972), *cert. denied* 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972), *rehearing denied*, 409 U.S. 1049, 93 S.Ct. 509, 34 L.Ed.2d 502 (1972).

Judge Rosenberg of this Court found that the Pennsylvania foreign attachment rules were not violative of the Constitution in an opinion issued September 6, 1974, less than a month before plaintiff's praecipe for writ of attachment in the present case was filed. *Balter v. Bato Co.*, 385 F.Supp. 420 (W.D.Pa.1974).

Judge Gourley of this Court upheld the foreign attachment rules in his Opinion dated December 2, 1974, in the case of *McFadden v. G. H. McShane Co., supra*.

In the case of *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the Supreme Court expressly acknowledged that the State's need to obtain immediate jurisdiction over non-resident defendants in state courts was "clearly a most basic and important public interest" which justified the attachment of property without prior notice or hearing. 407 U.S. at 91, 92 S.Ct. at 1999, 32 L.Ed.2d at 576, n. 23.

In the case of *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), decided after *Fuentes*, the Supreme Court upheld the validity of a Louisiana statute which permitted the sequestration of property upon the *ex parte* application of a creditor without notice or hearing. In so holding the Court clearly receded from the sweeping language set forth in its *Fuentes* decision, to the extent that Justice Stewart (who wrote the opinion in *Fuentes* ) concluded that *Fuentes* had been "unmistakably overruled." 416 U.S. at 635, 94 S.Ct. at 1913, 40 L.Ed.2d at 429.

this point, to mention that Judge Teitelbaum of this Court first held the Pennsylvania foreign attachment procedures to be unconstitutional by his opinion filed April 7, 1975 in the case of *Jonnet v. Dollar Savings Bank of City of New York*, 392 F.Supp. 1385, *affirmed* 530 F.2d 1123 (Third Circuit Court of Appeals, January 27, 1976), relying heavily on the Supreme Court opinion in *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), involving the constitutionality of a Georgia statute under which the plaintiff corporation had garnished defendant's bank account by issuance of a writ of garnishment on the affidavit of the plaintiff without participation of a judge, upon the posting of bond for double the amount sworn to be due. Thus, it is noted that the Pennsylvania Rule of Civil Procedure regarding foreign attachments had not been declared invalid in October of 1974 when the Plaintiff brought the instant action and sought to make use of the Rules. It then becomes apparent that the sole basis for the Defendant's Counterclaim in the case *sub judice* must be that the *Jonnet* decision should be applied retroactively. *Fuentes* cannot be the basis for such suit for there is an interest of the State involved in jurisdiction over non-residents.

It is noted that in *Fuentes*, the Supreme Court was concerned that the State did not have an important governmental or general public interest to justify the postponement of the due process rights to an opportunity for hearing until after the seizure of the property. Thus, Justice Stewart said (407 U.S. at 91, 92 S.Ct. at 2000, 32 L.Ed.2d 556 at p. 576):

".  .  . First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated foods.

The Florida and Pennsylvania prejudgment replevin statutes serve no such important governmental or general public interest. They allow summary seizure of a person's possessions when no more than private gain is directly at stake. The replevin of chattels, as in the present cases, may satisfy a debt or settle a score. But state intervention in a private dispute hardly compares to state action furthering a war effort or protecting the public health.

Nor do the broadly drawn Florida and Pennsylvania statutes limit the summary seizure of goods to special situations demanding prompt action. There may be cases in which a creditor could make a showing of immediate danger that a debtor will destroy or conceal disputed goods. But the statutes before us are not 'narrowly drawn to meet any such unusual condition.' *Sniadach v. Family Finance Corp., supra*, [395 U.S. 337] at 339, [89 S.Ct. 1820 at 1821] 23 L.Ed.2d [349] at 352. And no such unusual situation is presented by the facts of these cases.

The statutes, moreover, abdicate effective state control over state power. Private parties, serving their own private advantage, may unilaterally invoke state power to replevy goods from another. No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters. The State acts largely in the dark." [Footnotes omitted.]

And in particular, the Court noted (407 U.S. at p. 91, 92 S.Ct. at p. 1999, 32 L.Ed.2d at p. 576, n. 23):

" . . . In three cases, the Court has allowed the attachment of property without a prior hearing. In one, the attachment was necessary to protect the public against the same sort of immediate harm involved in the seizure cases—a bank failure. *Coffin Bros. & Co. v. Bennett,* 277 U.S. 29 [48 S.Ct. 422], 72 L.Ed. 768. Another case involved attachment necessary to secure jurisdiction in state court—clearly a most basic and important public interest. *Ownbey v. Morgan,* 256 U.S. 94 [41 S.Ct. 433], 65 L.Ed. 837, 17 A.L.R. 873. It is much less clear what interests were involved in the third case, decided with an unexplicated per curiam opinion simply citing *Coffin Bros.* and *Ownbey. McKay v. McInnes,* 279 U.S. 820 [49 S.Ct. 344], 73 L.Ed. 975. . . ."

We must further consider the Supreme Court's decision in *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), which was decided after *Fuentes, supra,* and less than five months before the filing of the Plaintiff's writ of foreign attachment in the present case. There, Justice White in an opinion expressing the view of five members of the Court, held that issuance of a sequestration writ without notice and hearing did not violate procedural due process since the Louisiana system adequately protected the debtor's interest, and that where only property rights are involved, mere postponement of judicial inquiry is not a denial of due process if the opportunity given for ultimate judicial determination of liability is adequate. The Court held as follows (416 U.S. at p. 611, 94 S.Ct. at p. 1902, 40 L.Ed.2d at pp. 416–417):

" . . . The usual rule has been '[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.' *Phillips v. Commissioner,* 283 U.S. 589, 596–597 [51 S.Ct. 608, 611], 75 L.Ed. 1289 (1931). *See also Scottish Union & National Ins. Co. v. Bowland,* 196 U.S. 611, 632 [25 S.Ct. 345, 352], 49 L.Ed. 619 (1905); *Springer v. United States,* 102

U.S. 586, 593–594, 26 L.Ed. 253 (1881). This generality sufficed to decide relatively modern cases. For example, in *Ewing v. Mytinger & Casselberry,* 339 U.S. 594 [70 S.Ct. 870], 94 L.Ed. 1088 (1950), the statute at issue permitted multiple seizures of misbranded articles in commerce ' "when the Administrator has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Agency that the misbranded article . . . would be in a material respect misleading to the injury or damage of the purchaser or consumer." ' Id. [339 U.S.], at 595–596 [70 S.Ct. at 871], 26 L.Ed. 253 [94 L.Ed. 1088]. The specific seizure challenged, made administratively without prior notice or hearing, concerned a concentrate of alfalfa, watercress, parsley, and synthetic vitamins, combined in a package with mineral tablets. There was no claim or suggestion of any possible threat to health. The sole official claim was that the labeling was misleading to the alleged damage of the purchaser. The Court sustained the ex parte seizure saying that '[w]e have repeatedly held that no hearing . . . is required by due process so long as the requisite hearing is held before the final administrative order becomes effective.' Id., [339 U.S.] at 598 [70 S.Ct. at 872, 26 L.Ed. 253, 94 L.Ed. 1088]. 'It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.' Id., [339 U.S.] at 599, 70 S.Ct. at 873, [94 L.Ed. 1088].

More precisely in point, the Court had unanimously approved prejudgment attachment liens effected by creditors, without notice, hearing, or judicial order, saying that 'nothing is more common than to allow parties alleging themselves to be creditors to establish in advance by attachment a lien dependent for its effect upon the result of the suit.' 'The fact that the execution is issued in the first instance by an agent of the State but not from a Court, followed as it is by personal

notice and a right to take the case into court, is a familiar method in Georgia and is open to no objection.' *Coffin Bros. v. Bennett*, 277 U.S. 29, 31 [48 S.Ct. 422, 423], 72 L.Ed. 768 (1928). To the same effect was the earlier case of *Ownbey v. Morgan*, 256 U.S. 94 [41 S.Ct. 433], 65 L.Ed. 837, 17 A.L.R. 873 (1921). Furthermore, based on *Ownbey* and *Coffin*, the Court later sustained the constitutionality of the Maine attachment statute. *McKay v. McInnes*, 279 U.S. 820 [49 S.Ct. 344], 73 L.Ed. 975 (1929). In that case, a non-resident of Maine sued in the Maine courts to collect a debt from a resident in the State. As permitted by statute, and as an integral part of instituting the suit, the creditor attached the properties of the defendant, without notice and without judicial process of any kind. In sustaining the procedure, the Maine Supreme Court, 127 Me. 110, 141 A. 699 (1928), described the attachment as designed to create a lien for the creditor at the outset of the litigation. 'Its purpose is simply to secure to the creditor the property which the debtor has at the time it is made so that it may be seized and levied upon in satisfaction of the debt after judgment and execution may be obtained.' Id. [127 Me.], at 115, 141 A. at 702. The attachment was deemed 'part of the remedy provided for the collection of the debt,' ibid., and represented a practice that 'had become fully established in Massachusetts, part of which Maine was, at the time of the adoption of the Federal Constitution.' Id. [127 Me.], at 114, 115, 141 A. at 702. The judgment of the Maine court was affirmed without opinion, citing *Ownbey* and *Coffin*." [Footnote omitted.]

In *Mitchell, supra*, Justice Stewart dissented on the basis that the Court had rejected the reasoning of the *Fuentes* case and had adopted instead the analysis of the dissent. Justice Stewart went so far as to say (416 U.S. at p. 634, 94 S.Ct. at p. 1913, 40 L.Ed.2d at p. 429):

"I would add, however, a word of concern. It seems to me that unless we respect the constitutional decisions of this Court, we can hardly expect that others will do so. *Cf. Roofing Wholesale Co. v. Palmer*, 108 Ariz. 508, 502 P.2d 1327 (1972). A substantial departure from precedent can only be justified, I had thought, in the light of experience with the application of the rule to be abandoned or in the light of an altered historic environment. Yet the Court today has unmistakably overruled a considered decision of this Court that is barely two years old, without pointing to any change in either societal perceptions or basic constitutional understanding that might justify this total disregard of stare decisis."

■ Defendant in this case would require the Plaintiff not only to guess, but to guess right, on a very important procedural matter. It is therefore abundantly clear that *Fuentes* did not foreshadow an end to the Pennsylvania foreign attachment procedures as indicated by the opinions of two members of this Court, Judges Rosenberg and Gourley,[5] upholding the constitutionality of the foreign attachment procedures of this State in late 1974.

## II. RETROACTIVITY.

Having disposed of the contention that *Fuentes* clearly foreshadowed an end to Pennsylvania's foreign attachment procedures, we now turn to the contention that the decision in *Jonnet*, which found the Pennsylvania rules on foreign attachment to be unconstitutional, filed fifteen months after the Defendant McFadden's Counterclaim, should be applied retroactively *sub judice*.

There is very clear guidance in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), which held that a Louisiana statute of limitations should not be given retroactive application under the Supreme Court decision in *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), because the case had been first filed more than one

---

**5.** *See* Footnote 1, *supra*.

year prior to the *Rodrigue* decision and because *Rodrigue* resulted in an unforeseeable overturning of existing legal doctrine. The Court stated as follows in *Chevron, supra* (404 U.S. 106, 92 S.Ct. 355, 30 L.Ed.2d 306):

"In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, *see, e. g., Hanover Shoe v. United Shoe Machinery Corp., supra*, 392 U.S. [481], at 496, [88 S.Ct. 2224 at 2233], 20 L.Ed.2d 1231, at 1243, or by deciding an issue of first impression whose resolution was not clearly foreshadowed, *see, e. g., Allen v. State Board of Elections, supra*, 393 U.S. [544], at 572, [89 S.Ct. 817 at 835], 22 L.Ed.2d 1 at 20. Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' *Linkletter v. Walker, supra*, 381 U.S. [618], at 629, [85 S.Ct. 1731 at 1738], 14 L.Ed.2d 601 at 608. Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' *Cipriano v. City of Houma, supra*, [395 U.S. 701], at 706, [89 S.Ct. 1897 at 1900], 23 L.Ed.2d 647 at 652.

Upon consideration of each of these factors, we conclude that the Louisiana one-year statute of limitations should not be applied retroactively in the present case. *Rodrigue* was not only a case of first impression in this Court under the Lands Act, but it also effectively overruled a long line of decisions by the Court of Appeals for the Fifth Circuit holding that admiralty law, including the doctrine of laches, applies through the Lands Act. *See, e. g., Pure Oil Co. v. Snipes*, 293 F.2d 60; *Movible Offshore Co. v. Ousley*, 346 F.2d 870; *Loffland Bros. Co. v. Roberts*, 386 F.2d 540. When the respondent was injured, for the next two years until he instituted his lawsuit, and for the ensuing year of pretrial proceedings, these Court of Appeals decisions represented the law governing his case. It cannot be assumed that he did or could foresee that this consistent interpretation of the Lands Act would be overturned. The most he could do was to rely on the law as it then was. 'We should not indulge in the fiction that the law now announced has always been the law and, therefore, that those who did not avail themselves of it waived their rights.' *Griffin v. Illinois*, 351 U.S. 12, 26, 76 S.Ct. 585 [594], 100 L.Ed. 891, 903, 55 A.L.R.2d 1055 (Frankfurter, J., concurring in judgment)."

■ In the instant case we find the same factors involved for the *Jonnet* decision rendered unconstitutional a statute which had been in use in Pennsylvania for one hundred and forty years. The *Jonnet* case will be extended to retard future prejudgment attachments of property, as applied prospectively and not punishing retrospectively. Clearly, to hold otherwise would produce inequitable results. A consideration of the three factors then leads this Court to the conclusion that it should not be retroactively applied. See also *Kacher v. Pittsburgh National Bank*, decided by this Court (C.A. 75–610, October 20, 1975).

The Defendant strongly urges that the decision changing the law was not *Jonnet*, but *Fuentes*. However, we believe this to be clearly in error. It cannot be argued, as Defendant would, that the Plaintiff knew that seizure of Defendant's rents without prior court approval was unlawful under *Fuentes* and *Mitchell*, and *a fortiori* that its refusal to release the attachments after Defendant had entered a general appearance was completely without justification. The Defendant in a rather emotional appeal states that he could have used in his Counterclaim the phrase long employed in pleading at Common Law, that the Plaintiff's conduct was "prompted by the devil". This

appeals more to the Court as being a clear indication that there is no rationale in the Defendant's position. The Motion to Vacate Dismissal of Counterclaim will therefore be denied.

An appropriate Order will be entered.