408 F.Supp. 1398 (1976)
NORWICH & WORCESTER RAILROAD COMPANY, Petitioner,
v.
UNITED STATES of America et al., Respondents.
Robert W. BLANCHETTE et al., Trustees of the Property of Penn Central Transportation Company, Debtor, Petitioners,
v.
UNITED STATES RAILWAY ASSOCIATION et al., Respondents.
Nos. 75-2, 75-3.
Special Court Regional Rail Reorganization Act
Argued January 30, 1976.
Decided February 12, 1976.
*1399 George F. Galland, Washington, D.C. (Robert W. Ginnane, and Galland, Kharasch, Calkins & Brown, Washington, D.C., of counsel), for petitioner Norwich & Worcester R. Co.
Brice M. Clagett, Washington, D.C. (Charles A. Horsky, Covington & Burling, Washington, D.C., and Paul R. Duke, Philadelphia, Pa., of counsel), for petitioner Penn Central Trustees.
William R. Perlik, Washington, D.C. (Louis R. Cohen, Stephen F. Black, William T. Lake, and Wilmer, Cutler & Pickering, Washington, D.C., of counsel), for United States Ry. Assn.
John Hart Ely, Gen. Counsel, James I. Singer, and Jerome E. Sharfman, U. S. Dept. of Transp., Washington, D.C., for the United States.
John G. Harkins, Jr., Laurence Z. Shiekman, and Pepper, Hamilton & Sheetz, Philadelphia, Pa., for Consolidated Rail Corp.
Nathaniel H. Goodrich, Washington, D.C., for National Railroad Passenger Corp.
Paul C. Warnke, James T. Stovall, III, and Clifford, Warnke, Glass, McIlwaine & Finney, Washington, D.C., for Southern R. Co.
John L. Rogers, Jr., Baltimore, Md., for Chesapeake and Ohio R. Co.
William H. Ewing, and Joseph J. Connolly, Philadelphia, Pa., for The Connecting Ry. Co. and John C. Kohl, Trustee of the Property of The Philadelphia, Baltimore and Washington R. Co.
Mark Willcox, Jr., and Herbert G. Schick, Philadelphia, Pa., for Trustee of the Property of The Michigan Central R. Co.
Jerome K. Walsh, New York City, for Trustee of the Properties of the Cleveland, Cincinnati, Chicago and St. Louis Railway Co. and Penndel Co.
Joseph J. Connolly, Philadelphia, Pa., for New York Connecting R. Co., Fort Wayne & Jackson R. Co. and Little Miami R. Co., as amici curiae.
Charles I. Thompson, Jr., Philadelphia, Pa., for The North Pennsylvania R. Co. and Philadelphia, Germantown and Norristown R. Co., as amici curiae.
Leon Leighton, New York City, for Minority Stockholders of Mahoning Coal Railroad, as amicus curiae.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
FRIENDLY, Presiding Judge:
The petitioners in these two actions request the Special Court to determine that certain property described in the petitions is not subject to compulsory conveyance under § 303(b) of the Regional Rail Reorganization Act of 1973 (RRRA) as amended. This opinion deals only with the question whether, in the light of the important amendments in Title VI of the Railroad Revitalization and Regulatory *1400 Reform Act of 1976, adopted February 5, 1976, the Special Court may hear these petitions before the conveyance rather than later. We will assume familiarity with the plan and structure of RRRA as amended  a course we intend to follow generally in the interests of expedition and of such brevity as is attainable.
The Norwich & Worcester Railroad Company (Norwich) owns a line of railroad between Groton, Conn., and Worcester, Mass. It was leased to a predecessor of the New York, New Haven & Hartford Railroad Company (New Haven) in 1869 for a term of 100 years. The lease was assumed by the New Haven and was later affirmed by its reorganization trustees. Inclusion of Norwich in the Penn Central system was required in Pennsylvania R. Co.  Merger  New York Central R. Co., 344 I.C.C. 25, 90 et seq. (1968), although the ICC noted that new arrangements would have to be made when the lease expired on February 1, 1969. No such arrangements were made, and Penn Central and subsequently its trustees have continued to operate the Norwich, without payment since the Penn Central bankruptcy save for a single quarterly installment at the beginning.
The Final System Plan (FSP), which became effective through lack of Congressional veto on November 9, 1975, recognized the Norwich to be "a special situation," Vol. I, p. 228. Conceding that the rail properties of the Norwich were not the rail properties of a railroad in reorganization or of a railroad leased or controlled by such a railroad, the FSP asserted that these were subject to designation under § 206(c)(1) and conveyance under § 303(b) because they were operated by a railroad in reorganization, the Penn Central. Noting that Norwich had challenged this reading of the Act and that this court would have the opportunity to settle the question "in proceedings under section 303 of the Act," the FSP offered the northern portion of Norwich to the Providence & Worcester Railroad (P&W) and made a designation of the southern portion to ConRail. All these were subject to qualifications. One, which has now become academic, was that if within 60 days of the effective date of FSP the Norwich should enter "into an arrangement with another railroad (presumably the Providence and Worcester) for the sale or operation of the designated properties," the designation to ConRail should not become effective and the Norwich and the other railroad should be left free to implement their agreement outside RRRA. A second, which has not happened as yet, is that ConRail should work out arrangements whereby P&W would operate the southern end of Norwich's line. Finally, none of the designations were to become effective if, within 60 days of the effective date of FSP, the Norwich presented to USRA "a sound plan to operate the line on and after conveyance date, which would maintain the same service coverage as the designations would provide." Norwich developed a plan and, without conceding jurisdiction, submitted it to USRA within the stipulated time. USRA has not yet determined whether the plan meets the requirements of FSP. We assume it will make such a determination before the certification date.
Norwich's position is that RRRA did not contemplate that a rail line should be subject to designation and conveyance simply because a railroad in reorganization continued to operate it after the termination of a lease five years before RRRA was enacted; if RRRA purports to do this, Norwich says it is unconstitutional. It asked us to declare that for one reason or the other its railroad is not subject to conveyance.[1]
The petition of the Penn Central Trustees, as originally filed on December 23, 1975, claimed that a large number of designations in FSP of properties to be conveyed went beyond what RRRA authorized or constitutionally could. However, in view of changes made by the *1401 1976 amendments and other developments, the Penn Central Trustees, in an amended petition which we gave leave to file, F.R.Civ.P. 15(a), have considerably restricted the transactions concerning which they seek pre-conveyance relief. These requests are now limited to (1) the designation of properties of two non-railroad subsidiaries, the interest of Manor Real Estate Company, a wholly-owned subsidiary, in the Buckeye Yard, see FSP Vol. I, pp. 229 and 262, and certain assets of Pennsylvania Truck Lines, Inc., another subsidiary, see FSP Vol. I, pp. 230 and 262; (2) the designation of various Canadian properties, now limited by USRA to the stock and leasehold interests of Penn Central and the secondary debtor, The Michigan Central Railroad Company (a 99.9% owned subsidiary), in a number of companies incorporated in Canada or both in Canada and in the United States, to wit, the Canada Southern Railroad Co., Detroit River Tunnel Co., Niagara River Bridge Co., see FSP Vol. I, pp. 229 and 262,[2] and St. Lawrence & Adirondack Railway Company; and (3) the designation of the stock interests of the Mahoning Coal Railroad Co. in the Lake Erie and Eastern Railroad Co. and of the Peoria and Eastern Railway Co. in the Peoria and Pekin Union Railway Co., see FSP Vol. I, p. 262. The Trustees sought a declaration that the designations described in the petition were unlawful and that they need not transfer the properties there specified.
On January 15, 1976, USRA and four other respondents answered the original petition of the Penn Central Trustees; the United States, which we had allowed to intervene as a respondent, joined in this answer. After the argument referred to below, we received an answer and cross-petition on behalf of certain other respondents, to wit, Connecting Railway Company and the Trustees of four subsidiary debtors, The Cleveland, Cincinnati, Chicago & St. Louis Railway Company, The Michigan Central Railroad Company, Penndel Company, and the Philadelphia, Baltimore & Washington Railroad Company. The cross-petition joins in certain requests for relief which the Penn Central Trustees have now withdrawn, but does not raise any different legal issues; we do not think, in light of what we are about to say, that it needs to be treated separately. The United States has answered the petition of the Norwich; we have granted USRA extensions of its time to answer in order to enable it to complete its study of Norwich's plan.

II.
On December 19, 1975, shortly after the filing of the Norwich's petition and before the filing of the petition of the Penn Central Trustees, both houses of Congress, immediately before their adjournment, adopted an amendment to RRRA as part of a much broader enactment, now the Railroad Revitalization and Regulatory Reform Act of 1976. The amendment took account of important differences in the capital structure of ConRail in FSP from the formulation in the 1973 Act and made other modifications. One important modification was § 602(b), which added a new § 209(e). The proposed new subsection would have rendered explicit this court's jurisdiction over certain types of actions relating to the implementation of the Plan and made such jurisdiction exclusive but, in the penultimate sentence of § 209(e)(1), created a limitation on our hearing or determination of such actions prior to conveyance. Anticipating that this or some similar provision would become law, and taking account of the *1402 short time that would be available before the conveyance date,[3] the Presiding Judge, with the approval of the other judges, addressed a letter to counsel requesting briefs on the issue whether the penultimate sentence of § 209(e)(1), if enacted, would preclude hearing or determination of the petitions of the Norwich and the Penn Central Trustees prior to the date of conveyance. Briefs were submitted on January 19 and answering briefs on January 27. The court heard oral argument on January 30.
In fact Congress did not send the bill adopted on December 19, 1975 to the President. Instead, after the conclusion of its adjournment, it adopted a new bill on January 28, 1976, which the President signed on February 5, 1976. The new § 209(e), which differs in only a few respects from that in the December 19 bill, reads:
"(e) ORIGINAL AND EXCLUSIVE JURISDICTION.  (1) Notwithstanding any other provision of law, any civil action 
"(A) for injunctive or other relief against the Association from the enforcement, operation, or execution of this Act or any provision thereof, or from any action taken by the Association pursuant to authority conferred or purportedly conferred under this act;
"(B) challenging the constitutionality of this Act or any provision thereof;
"(C) challenging the legality of any action of the Association, or any failure of the Association to take any action, pursuant to authority conferred or purportedly conferred under this Act;
"(D) to obtain, inspect, copy, or review any document in the possession or control of the Association that would be discoverable in litigation pursuant to section 303(c) of this Act;
"(E) brought after a conveyance, pursuant to section 303(b) of this Act to set aside or annul such conveyance or to secure in any way the reconveyance of any rail properties so conveyed; or
"(F) with respect to continuing reorganization and supplemental transactions, in accordance with section 305 of this Act;
shall be within the original and exclusive jurisdiction of the special court. The special court shall not hear or determine any such action prior to the date of conveyance, pursuant to section 303(b)(1) of this Act, except as the Constitution may require. Relief shall not be granted in any action referred to in subparagraph (A), (C), or (E) unless the person seeking such relief establishes that the Association acted in reckless or deliberate disregard of applicable law.
"(2) The original and exclusive jurisdiction of the special court shall include any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to section 303(b) of this Act in order to effect the purposes of this Act or the goals of the final system plan. During the pendency of any proceeding described in this paragraph, the special court may enter such orders as it determines to be appropriate, including orders enjoining, restraining, conditioning, or limiting any conveyance, transfer, or use of any asset or right which is subject to such an order or which is at issue in such a proceeding, or which involves the enforcement of any liens or encumbrances upon such assets or rights. Any orders pursuant to this paragraph which interpret, alter, amend, modify, *1403 or implement orders entered by the special court shall be final and shall not be restrained or enjoined by any court.
"(3) A final order or judgment of the special court in any action referred to in this section shall be reviewable only upon petition for a writ of certiorari to the Supreme Court of the United States, except that any order or judgment enjoining the enforcement, or declaring or determining the unconstitutionality or invalidity, of this Act, in whole or in part, or of any action taken under this Act, shall be reviewable by direct appeal to the Supreme Court of the United States in the same manner that an injunctive order may be appealed under section 1253 of title 28, United States Code. Such review is exclusive and any petition or appeal shall be filed not more than 20 days after entry of such order or judgment."
The text of the bill as proposed in the Conference Report, H.R.Rep.No.94-781, 94th Cong.2d Sess., was available for discussion in the answering briefs. Further amendments, not material to the point here at issue, were handed up to us at the argument.
If the actions are within § 209 (e)(1), we must decline to hear or determine them prior to conveyance unless the Constitution otherwise requires. On their face they would appear to fall under subdivisions (A), (B) and (C). With respect to (A) and (C), the Penn Central Trustees argue that they are not seeking relief against USRA from any action taken by it or challenging the legality of any action of USRA,[4] but are merely inviting this court's attention to the fact that the certified copy of FSP and the certificates to be delivered by USRA under § 209(c) will go beyond the authority which Congress conferred on USRA or, in some respects, the authority which Congress could constitutionally confer, and consequently beyond our own power to act. This is a wholly artificial reading both of the statute and of the petitions. Petitioners' grievances concern the designations that USRA made in the FSP. USRA was named as a respondent in both petitions. The Norwich asked us to hold that "the Congress did not and, under the Constitution, could not empower USRA in the FSP to direct a disposition of the properties of Norwich & Worcester or the Special Court to convey such properties in accordance with the FSP . . .." The initial petition of the Penn Central Trustees asked us to declare that certain designations of transfer in FSP "are beyond the authority of respondent USRA and are unlawful," and although the prayer for relief in the amended petition omitted reference to USRA, USRA was named as a respondent, as it had to be, and in substance the Penn Central Trustees were still seeking the same relief. The final Conference Report said in explaining the addition of the penultimate sentence of § 209(e)(1), p. 188:
The critical public interest in the orderly and timely completion of the vast Northeast rail reorganization as set forth in the final system plan justifies deferring such judicial review until after conveyance.
We must read the statute and the petitions to give effect to that purpose "except as the Constitution may require" otherwise. We turn therefore to the petitioners' assertions that it does.
(1) Petitioners' broadest contention is that the Constitution inevitably requires pre-conveyance determination whether FSP conforms to RRRA and is constitutional, since Congress cannot direct an Article III court to order a conveyance without the court's previous investigation of its statutory and constitutional *1404 authority to do this. The Penn Central Trustees cite to us in this connection United States v. Klein, 13 Wall. (80 U.S.) 128, 145-47, 20 L.Ed. 519 (1872), Mr. Justice Rutledge's dissent in Yakus v. United States, 321 U.S. 414, 468, 64 S.Ct. 660, 88 L.Ed. 834 (1944), and the statement of the late Professor Henry M. Hart, Jr., in the famous dialogue, that "if Congress directs an Article III court to decide a case, I can easily read into Article III a limitation on the power of Congress to tell the court how to decide it." The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362, 1373 (1953), reprinted in Hart & Wechsler, The Federal Courts and The Federal System at 337 (2d ed. 1973). But here the "case" should not be regarded as the conveyance simpliciter but as the conveyance plus an opportunity, explicitly afforded by §§ 209(e)(1)(E) and 209(e)(2) for post-conveyance review.[5] This brings into play Professor Hart's statement, id. at 332:
The denial of any remedy is one thing  that raises the question we are postponing. But the denial of one remedy while another is left open, or the substitution of one for another, is very different. It must be plain that Congress necessarily has a wide choice in the selection of remedies, and that a complaint about action of this kind can rarely be of constitutional dimension. (Emphasis in original.)
Cf. Springer v. United States, 102 U.S. 586, 26 L.Ed. 253 (1881); Phillips v. C. I. R., 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931).
(2) In what apparently is an elaboration of their more general contention, the Penn Central Trustees argue as follows: Citing statements by this court, 384 F.Supp. 895, 948-51 (1974), and the Supreme Court, 419 U.S. 102, 148-56, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), petitioners say that RRRA is solely a reorganization statute enacted under the bankruptcy power; that the properties of a solvent railroad or other entity are not subject to bankruptcy reorganization simply because a bankrupt has an interest in them; and that even if the eminent domain power can properly be invoked in support of FSP, Congress cannot require the passing of title prior to the payment of full compensation and, a fortiori, cannot demand the assistance of an Article III court in such an enterprise.
The first branch of petitioners' argument is seriously flawed. The extracts cited from the opinions of this court and the Supreme Court do not establish what petitioners say they do; indeed their effect is quite the opposite. What was said was that RRRA drew both on the bankruptcy power and on the authority of Congress to exercise eminent domain under the commerce power. Indeed it was this latter authority that was the basis for holding that any inadequacies in the compensation afforded under RRRA could be recovered in an action in the Court of Claims under the Tucker Act, 384 F.Supp. at 939-40, 419 U.S. at 125-26, 95 S.Ct. 335.
On the second branch of the argument, the decision in Callaway v. *1405 Benton, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949), urged on us in the argument of counsel for the Penn Central Trustees as being dispositive, does not hold at all that the bankruptcy power could not extend to the rail properties of solvent lessors of railroads in reorganization. So far as here relevant, it held only that § 77 of the Bankruptcy Act did not purport to do so. It is true that, as stated in Judge McGowan's opinion for us, 384 F.Supp. at 963-64, the notice of appeal of the United States and USRA from the "180-day" order of Judge Fullam relating to the Penn Central secondary debtors "disclaimed any contention that non-bankrupt lessors of rail properties to Penn Central can constitutionally be compelled to transfer such properties to Conrail on other than an eminent domain theory." The FSP, Vol. I, pp. 127-28, asked us not to regard this disclaimer and similar oral statements in open court by counsel for the United States "as an absolute and final concession that eminent domain concepts provided the appropriate theory for valuing assets transferred from nonbankrupt entities subject to the Act." Several non-bankrupt lessors have urged that we should say nothing now that would contradict the effect of the assurances previously given. We shall honor these requests by the lessors and leave the question open, since determination of it is not essential here.
Assuming that FSP includes some takings that are justifiable only as an exercise of eminent domain, we do not find that the two decisions cited by the Penn Central Trustees, Albert Hanson Lumber Co. v. United States, 261 U.S. 581, 587, 43 S.Ct. 442, 67 L.Ed. 809 (1923), and United States v. Dow, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), establish the proposition that title cannot be taken in eminent domain except when full compensation is simultaneously paid in cash. To the contrary, the Supreme Court has upheld the constitutionality of taking title without contemporaneous payment of any compensation so long as the applicable statute "recognizes the absolute right of the owner, upon his property being taken, to just or reasonable compensation therefor, and makes provision . . . for the ascertainment . . . of the compensation to which, under the constitution, he is entitled," Sweet v. Rechel, 159 U.S. 380, 404, 16 S.Ct. 43, 50, 40 L.Ed. 188 (1895). The Declaration of Taking Act, 40 U.S.C. §§ 258a-258d, expressly provides that title shall pass upon the filing of the declaration and payment of the estimated compensation into court without any advance determination of the propriety of the taking. The Supreme Court has construed the statute "to confer upon the Government, upon occurrence of the events specified, only a defeasible title in cases where an issue concerning the validity of the taking arises." Catlin v. United States, 324 U.S. 229, 241, 65 S.Ct. 631, 637, 89 L.Ed. 911 (1945). We cannot think the result in Catlin would have been different if the Declaration of Taking Act required a court to issue a judgment conveying such a "defeasible title;" indeed, a judgment had been rendered in that very case. Judicial participation in a summary conveyance of title by eminent domain, with questions of validity and valuation reserved for future determination, was sustained in Fifth Ave. Coach Lines v. City of New York, 11 N.Y.2d 342, 229 N.Y.S.2d 400, 183 N.E.2d 684 (1962).
We read §§ 209(e)(1)(E) and (e)(2) as leaving open for post-conveyance determination just such issues of validity as those of which the Supreme Court spoke in Catlin, see fn. 5, and we consider USRA's certification under § 209(c) and the deposits under § 303(a) to be the functional equivalents of the declaration of taking and the deposit of the estimated compensation.[6]
*1406 (3) Other arguments as to the inadequacy of the post-conveyance remedy are not persuasive. If petitioners have wrongfully been deprived of possession to the extent that conveyances have been improperly made, they can recover the fruits of possession whether in this court or in the Court of Claims. Similarly if, as Norwich suggests, the property might be subjected to liens before reconveyance, this too can be compensated. Also, the danger of consensually created liens or dispositions could be averted by an order on a post-conveyance motion for interlocutory relief, which § 209(e)(2) specifically contemplates.
(4) The Penn Central Trustees raise a special point in regard to the provisions of FSP concerning properties in Canada. This problem has been greatly alleviated by USRA's election not to require the conveyance of fee interests of Canadian subsidiaries in property in Canada and to certify only the conveyance of the stock and leasehold interests of Penn Central and Michigan central in such subsidiaries. We perceive no constitutional problem in this, Restatement (Second) of the Foreign Relations Law of the United States, § 30 (1965); in any event this could be considered after conveyance. It is true that, as is also explained in id. § 40, a nation should conduct itself so as to avoid a conflict in a matter where another also has jurisdiction, and we are told that Canadian approval of these transfers, or of some of them, may be needed. However, as USRA suggests, our decree can be conditioned on the obtaining of such approval, which the Trustees of Penn Central and Michigan Central must use their best efforts to obtain, cf. id. at 123.[7]
(5) The only remaining argument to show that the Constitution requires a pre-conveyance remedy rests on the provision in § 209(e)(1) that relief shall not be granted, except on constitutional grounds, "unless the person seeking such relief establishes that the Association acted in reckless or deliberate disregard of applicable law." This provision, however, is independent of the general ban on pre-conveyance remedies. To say that the Constitution requires a pre-conveyance remedy because of this provision shatters on the rock that the provision, if constitutional, would apply before conveyance as well as after, provided that the action is one of the types described in § 209(e)(1)(A) and (C), as we have held these to be. We thus find no occasion for now passing upon its constitutionality.
In concluding as we do that Congress directed us to defer hearing or determining these petitions until after conveyance and that such a direction does not violate the Constitution, we have not found it necessary to pass upon respondents' arguments concerning the general effect of the "Review by Congress" provided by § 208 and the special effect of § 208(d)(1).[8] We suggest, however, that the parties should immediately begin to research this question, since its decision will be of vital importance in proceedings which we will entertain promptly *1407 after conveyance. Our own investigation has yielded little. The Supreme Court did not consider that lack of Congressional objection during the period stipulated by the Rules Enabling Act, 48 Stat. 1064 (1934), settled that provisions of the Federal Rules of Civil Procedure were authorized. Sibbach v. Wilson & Co., 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941); Mississippi Publishing Co. v. Murphree, 326 U.S. 438, 444, 66 S.Ct. 242, 90 L.Ed. 185 (1946). In contrast the Third Circuit has held that § 202 of the Amtrak statute, 45 U.S.C. § 522,[9] evidenced a Congressional intention "that the final report designating the basic system, a document culminating a process essentially legislative in nature, be subject to review only in the legislative branch." City of Philadelphia v. Baker, 508 F.2d 279, 282 (3 Cir. 1975), cert. denied, 422 U.S. 1042, 95 S.Ct. 2657, 45 L.Ed.2d 694 (1975). However, in that case there appears to have been no claim that the Amtrak final report was not within the basic Congressional grant of power and no private rights were infringed. See also Quincy College & Seminary Corp. v. Burlington Northern, Inc., 328 F.Supp. 808 (N.D.Ill.1971), aff'd per curiam, 405 U.S. 906, 92 S.Ct. 939, 30 L.Ed.2d 777 (1972). Consideration of this problem will also have to take account of the effect of §§ 209(e)(1)(E) and 209(e)(2) and of the exception in § 209(e)(1) for action of USRA "in reckless or deliberate disregard of applicable law" which we have just discussed. Indeed, the question may have constitutional dimensions. It is sufficient here that petitioners' legal situation will be no worse in this regard after conveyance than before and under the statute may be better.
Accordingly, in obedience to § 209(e)(1), we shall not hear or determine these actions prior to the date of conveyance. This constitutes an order.
NOTES
[1] If USRA should approve the plan submitted by Norwich, the issue would become moot.
[2] The named companies own the line of railroad from Niagara Falls to Windsor, Ontario, and thence to Detroit, Mich., which is an integral part of the service provided from points in the United States east and south of Niagara Falls to Detroit and points beyond. FSP provided that neither the basic designation (of the fee interests) nor the alternative designation should become effective if, within 60 days of its effective date, Penn Central, Michigan Central, and Canada Southern entered into an agreement for the sale of the Canadian properties (presumably to Canadian National) subject to trackage rights for ConRail. This did not occur.
[3] Under the Act as adopted the date for USRA's delivery to us of a certified copy of FSP and the accompanying certifications was March 12, 1976, unless USRA by notice delivered not later than February 10, 1976, should extend the date for not more than 30 days. A joint resolution extending the February 10 date for 7 days is now before the President. Conveyance must follow within 20 days.
[4] At argument counsel for the Penn Central Trustees stressed that § 209(e)(1) as adopted differed from the December 19, 1975, version by the inclusion of the words "against the Association" and "by the Association" and by omission of a subdivision that would have given us jurisdiction over any action to enforce or declare rights under RRRA. For reasons later developed, we see no significance in this for the present context.
[5] Petitioners might counter that the opportunity is illusory in view of respondents' position that § 209(a) of RRRA, particularly with the gloss in the Conference Report, p. 188, precludes "review" of the propriety of FSP designations. If § 209(a) has such a preclusive effect, it has this before conveyance as well as after, unless that would be unconstitutional. Any narrowing of § 209(a) that may be required in order to sustain the constitutionality of RRRA can be achieved in post-conveyance proceedings.

The question how far designations in FSP are subject to challenge under § 209 is closely related to the question of the effect of Congressional "approval" of FSP which we discuss at the end of this opinion. If the approval has the effect of a statute, as respondents contend, the only basis for challenging designations would be that the designations were unconstitutional. We think it clear that Congress did not mean to exclude such challenges, although it did direct that their hearing or determination should be postponed until after conveyance unless such postponement itself would violate the Constitution.
[6] Counsel for the Penn Central Trustees called our attention at argument to Hessel v. A. Smith & Co., 15 F.Supp. 953 (E.D.Ill.1936), and United States v. 47.21 Acres of Land, 48 F.Supp. 73 (W.D.Ky.1943), which mentioned, as supporting the validity of the Declaration of Taking Act, the immediate availability of the Government's deposit, which is in cash. Whatever force these cases might or might not have had under RRRA as originally enacted, their effect is blunted by the new provision, § 306, for the deposit of certificates of value which are general obligations of the United States.
[7] It might well be desirable for the parties to endeavor to agree on suitable language for the decree.
[8] This provides:

"(d) ADDITIONS.  (1) The supplemental report, dated September 18, 1975, to the final system plan, and the provisions of the Association's official errata supplement to the final system plan, dated December 1, 1975, including all designations made therein, shall be treated for all purposes as if they had been part of and included in the final system plan adopted by the Association and reviewed by the Congress. The final system plan shall, for all purposes, be deemed to be approved as modified and amended by such supplemental report and such supplement."
The final Conference Report, p. 187, speaks of this as having the effect of granting "affirmative congressional approval to the final system plan." See also id. at pp. 188, 203.
[9] "The Secretary shall . . . submit his final report designating the basic system to the Congress. . . . The basic system as designated by the Secretary shall become effective for the purposes of this chapter upon the date that the final report of the Secretary is submitted to Congress and shall not be reviewable in any court". (emphasis supplied).