CONSOLIDATED RAIL CORPORATION, Petitioner,

v.

TRUSTEES OF PENN CENTRAL TRANSPORTATION COMPANY et al., Respondents.

Civ. A. No. 76–1.

Special Court, Regional Rail Reorganization Act.

Argued March 23, 1976.

Decided March 25, 1976.

John G. Harkins, Jr., Alexander Kerr, Laurence Z. Shiekman, Philadelphia, Pa. (Pepper, Hamilton & Scheetz), Philadelphia, Pa., for petitioner.

Paul R. Duke, Vice President, Law, and Matthew J. Siembieda, Penn Cent. Transp. Co., Philadelphia, Pa., and Brice M. Clagett, Washington, D. C. (Covington & Burling), Washington, D. C., for respondents other than the Trustees of Michigan Cent. R. Co.

Herbert G. Schieck (MacCoy, Evans & Lewis), Philadelphia, Pa., for respondent Trustee of Michigan Cent. R. Co.

Herbert E. Milstein, and Glen DeValerio, Washington, D. C. (Harold E. Kohn, Philadelphia, Pa., of counsel), for intervenors John L. Topping and John K. Custis, minority stockholders of Canada Southern R. Co.

William R. Perlik, Washington, D. C. (Wilmer, Cutler & Pickering), Washington, D. C., and Jordan Jay Hillman, Gen. Counsel, United States Railway Ass'n, Washington, D. C., for United States Railway Ass'n, amicus curiae.

Before FRIENDLY, P. J., and WISDOM and THOMSEN, JJ.

FRIENDLY, Presiding Judge.

I.

This action was begun by a petition of Consolidated Rail Corporation (ConRail) for an injunction against the respondents, who are the Trustees of Penn Central Transportation Company (Penn Central), the Trustee of Michigan Central Railroad Company (Michigan Central), and directors of Canada Southern Railroad Company (Canada Southern) and of Excelsior Truck Leasing Company (Excelsior).

Penn Central and Michigan Central own, respectively, 12.07% and 59.44% of the stock of Canada Southern, the remaining 28.49% being owned by some 400 public shareholders. Canada Southern owns a line of railroad from Niagara Falls through the southern part of Ontario to Windsor, Ontario; combined with the Niagara River Bridge and the Detroit River Tunnel, this affords a direct link in the Penn Central's operation from points in the United States east of Niagara Falls to Detroit, Michigan, and beyond. Canada Southern has not been an operating railroad for many years. In 1903 its rail assets were leased for 999 years to the Michigan Central, which in 1930 leased its stock and leasehold interest in Canada Southern to the New York Central for 99 years. The Final System Plan (FSP), as submitted to Congress, Vol. I, p. 262, designated the rail properties of Canada Southern for transfer to ConRail but made the following alternative designation:

The rail properties in Canada owned by the Canada Southern Railroad Co., the Detroit River Tunnel Co., and the Niagara River Bridge Co. which are designated in fee to ConRail are subject to the following alternative designation: If it should be determined that the transfer of properties owned and located in Canada designated in the FSP cannot be effected under the Act, then the stock and leasehold interest of PCTC and Michigan Central in the Canada Southern Railroad Co. and Detroit River Tunnel Co., the leasehold interest of the Penn Central and the stock interest of Canada Southern (if permitted by law) in Niagara River Bridge Co. are designated for transfer to ConRail.

Both the basic and the alternative designations of these properties will not become effective if within 60 days of the effective date of the FSP, Penn Central, Michigan Central, and Canada Southern, as appropriate, enter into a binding agreement for sale of the Canadian properties which reserves to ConRail trackage rights which, in the judgment of USRA, would provide operating and capital costs for ConRail similar to those under the designation and which are otherwise in accord with the needs of ConRail.

The proposed sale did not occur. In connection with the proceedings in *Blanchette v. United States Railway Association*, decided by this Court on February 12, 1976, 408 F.Supp. 1398, the Association agreed to make the alternative designation of stock and leasehold interests in Canada Southern, and this was included in the certification to this Court on March 12, 1976, as modified by the certification supplement.[1]

Excelsior is a wholly-owned subsidiary of American Contract Company (ACC), which is a wholly-owned subsidiary of Penn Cen-

1. Use of the alternative designation was dictated, at least in part, by a desire to avoid problems of international law incident to a compelled transfer of the rail properties.

tral. Excelsior is engaged in the business of leasing trucks and certain other equipment to railroads as well as to the public and of fabricating or modifying equipment to perform specialized tasks; the majority of Excelsior's leasing and fabricating is performed for Penn Central. The FSP, Vol. I, p. 263, as submitted to Congress, designated for transfer to ConRail the Penn Central's "leasehold interest in highway revenue equipment leased from Excelsior Truck Leasing except such equipment under leases not meeting lease designation standards." On February 25, 1976, pursuant to the authorization to make further designations contained in § 208(d)(3)(A) of the Regional Rail Reorganization Act of 1973, as amended (the Rail Act),[2] United States Railway Association (USRA) found that various "modified designations to the Corporation are necessary for the efficient implementation of the FSP." Among these was "All of the PCTC's and American Contract Company's right, title and interest in Excelsior Truck Leasing Company, including its common stock," 41 F.R. 8848.[3]

The controversy here at issue was initiated by a letter, dated March 3, 1976, from the Trustees of Penn Central, the Trustee of Michigan Central, and ACC to the judges of this court, with copies to counsel for ConRail and USRA. The letter advised that the directors of Canada Southern had stated their present intention to declare a dividend on March 12, 1976, of $60 (U.S.) per share, approximately $9,000,000 in all, to the shareholders of record as of March 23, 1976, payable March 30, 1976.[4] The letter stated that this would be an extraordinary dividend in an amount approximately equal to the retained earnings of Canada Southern and would be payable out of cash and marketable securities accumulated over many years from sources unrelated to Canada Southern's present rail properties. The letter further advised that the directors of Excelsior on March 12, 1976, would declare a dividend of $21,000 per share, a total of $2,100,000, to its sole stockholder, ACC, and would convey to ACC, presumably also as a dividend, property located at 1100 Ridge Pike, Conshohocken, Pennsylvania. The letter stated that the dividend was an extraordinary dividend of cash or securities not needed for the operation of Excelsior and that the property was purchased on December 30, 1975, after issuance of FSP and the December 1, 1975 errata sheet, which, as previously stated, had designated only the leasehold interest of the Penn Central Trustees in equipment leased from Excelsior; the letter further stated that ACC would, if so requested, lease the property back to Excelsior at a fair rental rate. Beyond this the letter said that the proceeds of all the cash dividends would be held in escrow accounts and the Conshohocken property would be held intact pending presentation of claims to the Penn Central reorganization court and its determination of them.

ConRail's petition in this action alleged that payment of the extraordinary dividends would constitute a disposition of a

---

**2.** This section provided that United States Railway Association, up to February 25, 1976, might "by notice to the Congress and by publication in the Federal Register, modify, supplement, or add to the designations of rail properties in the final system plan if the Association finds such actions are necessary to
(i) achieve the efficient implementation of the final system plan . . . ."

**3.** The February 25 notice comprises two parts. Part I was entitled "Designations to Achieve the Efficient Implementation of the Final System Plan Pursuant to Section 208(d)(3)(i) of the Act." This in turn was divided into five categories, of which the first two are here relevant. The first was entitled "A. Additions and modifications to the general designation and conveyance principles contained in the Final System Plan necessary to achieve the efficient implementation of the FSP." It consisted of various interpretations and characterizations; the preliminary statement and a passage particularly relevant to this action are quoted in text below. The second category was entitled "B. Additional Section 206 [sic] (d)(3)(i) designations to the Corporation relating to Sections 206(c)(1)(A), 206(c)(1)(B) and 206(c)(2) necessary to achieve the efficient implementation of the FSP." The additional designation with respect to Excelsior was in Category B.

**4.** Conveyances under the Rail Act are to be effective at 12:01 A.M. on April 1, 1976.

right or interest in rail property which was to be transferred to ConRail under FSP and would deprive ConRail of a substantial right or interest in the shares of stock in Canada Southern and Excelsior which were to be conveyed to it. It relied particularly on what it characterized as a designation in Part IA of the above-mentioned notice of February 25, 1976, see footnote 3, reading as follows, 41 F.R. 8846–47:

Part I—Designations to Achieve the Efficient Implementation of the Final System Plan Pursuant to Section 208(d)(3)(i) of the Act

A. *Additions and modifications to the general designation and conveyance principles contained in the Final System Plan necessary to achieve the efficient implementation of the FSP.* In certain instances, rail properties designated in the Final System Plan have been alleged (by trustees or others) not to have been so designated. In each case, these allegations have led or may soon lead to judicial proceedings, consuming the time of the courts, the Association, the Consolidated Rail Corporation (Corporation) and the transferors over such questions as whether the Final System Plan means what the Association believes it says. Although the Association believes each of the following designations in this Category A to be superfluous, the Association finds it necessary, in order to achieve the efficient implementation of the Final System Plan, to make these designations, however redundant they may be.

\* \* \* \* \* \*

4. Designations of stock interests in entities owning rail properties, particularly those interests conferring control of such entities, were made because of the rights, powers and interests they confer with respect to the assets and operations of the controlled entity. Recently, several such entities have been caused by various trustees of bankrupt estates to take actions which are outside of the ordinary course of business and which tend to destroy, encumber or diminish the control of, or rights with respect to, the underlying rail properties sought to be conferred on the Corporation through the designations of the stock interests. Concerns are raised by recent or threatened actions such as the removal of railroad operating personnel from customary and long-held directorships of subsidiaries and their replacement with nonrailroad employees of the trustees and the similar removal of regular management employees of subsidiaries and their replacement on a part-time basis by employees of the trustees. Similarly, the declaration of extraordinary dividends, the payment of inter-company claims which are in dispute or which have long been withheld from payment, and efforts to dispose of substantial assets of subsidiaries are examples of the kinds of actions which are inconsistent with the basic intent and requirements of the Rail Act and the purpose of the designations of stock interests in the Final System Plan. The basic reason for the designation of stock interests has been that the stock itself is a "rail property" because it provides control or rights with respect to underlying assets which themselves are used and useful in rendering rail transportation service. Consequently, pursuant to section 304(i) of the Act, the Association interprets its designations of stock interests as prohibiting transferors from causing or permitting, directly or indirectly, any entity in which they hold a stock interest designated for transfer in the FSP from taking any action outside of the ordinary course of business which has the effect of impairing, encumbering or diminishing the usefulness of the stock interest in rail transportation service, including without limitation, any action of the kinds described above.

ConRail sought a temporary restraining order, a temporary injunction and a permanent injunction against the declaration and payment of the dividends and the conveyance of the property. On March 10 and 11, 1976, counsel for the petitioner and for the respondents entered into two stipulations, unnecessary here to detail, which avoided the need for a temporary restraining order and provided that the hearing on the mo-

tion for a temporary injunction, which the court had set for March 23, 1976, might be consolidated with the hearing on the merits, pursuant to F.R.Civ.P. 65(a)(2)—a course which the court has advised the parties it will adopt—and agreed that all evidence which any party deemed necessary for the court to consider would be submitted in the form of stipulations, affidavits or depositions and that the court might render final judgment without taking any oral testimony. Respondents do not contend that this action falls within the penultimate sentence of § 209(e)(1) limiting our pre-conveyance hearing or determination of certain actions, which we applied in *Norwich & Worcester R.R. Co. v. United States* and *Blanchette v. United States Railway Association*, decided February 12, 1976, 408 F.Supp. 1398.

On March 19 counsel for two public stockholders of Canada Southern, who claim to represent fourteen others, holding in the aggregate approximately 20% of the publicly-held stock of Canada Southern, moved for leave to intervene. In a memorandum annexed to the motion, counsel stated, *inter alia*, that the public stockholders had long been protesting Canada Southern's accumulation of liquid assets unnecessary to the conduct of its business—more accurately lack of business; that the two applicants for intervention had instituted an action in the Court of Common Pleas of Philadelphia County, Pennsylvania, in August, 1975, to compel the declaration of a dividend; that a judge of that court had dismissed the complaint on the sole ground that Pennsylvania law did not enable her to pass on the internal affairs of a Canadian corporation; and that an appeal from that ruling is pending. We granted leave to intervene, on condition that intervenors would be bound by the stipulations of March 10 and 11.

## II.

It is well at this juncture to state certain provisions of the FSP, of a previous Order of this Court, and of the amendatory statute which, in addition to § 208(d)(3)(A), see Footnote 2, and the portion of the February 25 notice already quoted, bear on this controversy. One is the portion of FSP dealing with "Current Assets, Cash and Cash Equivalents" of transferors whose properties were designated for transfer, Vol. I, p. 253. This reads:

*Current Assets, Cash and Cash Equivalents.*—This includes, to the extent they are not elsewhere designated, all accounts receivable, deposits, bank accounts, interests in negotiable instruments, funds, reserves, cash and cash equivalents. These items are designated for transfer only to the extent that: they are segregated, earmarked, held aside or otherwise specifically allocated to the payment of liabilities that a transferee under the Act is or may become liable to pay, or represent amounts attributable to the operations or activities of a transferor for which a transferee assumes, either voluntarily or by operation of law, any present or future liability, absolute or contingent.

In general, the intention of the FSP is that accounts receivable and payable that are allocable to operations before conveyance shall be for the transferors, that receivables and payables that are allocable to operations after conveyance shall be for the transferees and that to whatever extent related personnel move to the transferees at the time of conveyance, the transferees will, subject to reimbursement of the cost, service the accounts as necessary on behalf of the transferors. In addition, the transferees will not take cash and other current assets except to the extent that (1) the items already have been, or should have been, set aside for purposes the transferees may be required to carry out, or (2) the transferees assume liabilities allocable to the transferors' operations. Items to be transferred will include, to the extent of the transferee's potential liability, withheld funds for the payment of taxes, pension funds and pension fund assets, funds for other employee benefits, other sinking funds and funded reserves.

Another is this Court's order of December 22, 1975, which enjoined persons identified therein "from selling, transferring, encumbering, or otherwise disposing . . . of

any rail property as defined in the Regional Rail Reorganization Act of 1973, designated for transfer" to ConRail or a profitable railroad, pending the conveyance to such transferees, save as therein provided. A third is § 304(i) of the amended Act which prohibits with certain exceptions the interim sale, transfer, encumbrance, or other disposition of "rail property, or any right or interest therein, designated for transfer to the Corporation or conveyance to a profitable railroad in the final system plan . . . ."

■ If there were nothing but these provisions and the designations of the stock interests in Canada Southern and Excelsior, we would agree with respondents that the complaint must be dismissed. Declaration and payment of a dividend, even an extraordinary dividend, do not fit within the verbs used by us or by Congress. However, in deciding the case we must also take account of paragraph 4 of USRA's notice of February 25, 1976, quoted above, and particularly the last sentence in which USRA purports to characterize what it meant by the designation of a stock interest.

### III.

■ We see no sufficient basis for the relief sought by ConRail with respect to Canada Southern. That company has not engaged in rail operations since 1903. No reason appears why its liquid assets could not have been used to declare dividends for many years. If they had been, the portion delivered into the hands of the Trustees of Penn Central and Michigan Central would not have been subject to transfer under the provisions we have quoted from Vol. I, p. 253, of FSP. If USRA had adhered to its primary designation, the funds would have remained with Canada Southern after the conveyance and could have been declared and paid as dividends. We cannot believe Congress thought that by using the alternate designation of stock and leasehold in-

terests in order to avoid possible problems of international law which might have existed with respect to a compelled transfer of the rail lines, USRA could confer on ConRail benefits far exceeding those under the primary designation.

ConRail is quite candid in admitting that it wants the dividend to be declared and paid, but only after the transfer rather than before, so that it may use the share that would have gone to the Penn Central Trustees and the Michigan Central Trustee for rehabilitation, not simply of Canada Southern's rail line, but anywhere in its system. This seems to be stretching the words of paragraph 4 of the February 25, 1976, notice, "which has the effect of impairing, encumbering or diminishing the usefulness of the stock interest in rail transportation service," beyond anything USRA could have meant or Congress authorized it to say.[5] With one of FSP's general principles being that conveyance of current assets would not be compelled, it would be strange that USRA, by this last minute redefinition of the designation of a stock interest, could in effect force such a conveyance simply because the dividends had not been paid before February 25, 1976.

### IV.

■ The case with respect to Excelsior is rather different. In contrast to Canada Southern, which, since 1903, has engaged in no activities except collecting rents, selling certain properties not included in the lease, and investing the proceeds, Excelsior was founded by Penn Central to perform an important function in the procurement of specialized sorts of trucking equipment which it then leases to Penn Central. The nature of the business is such that Excelsior must have a substantial amount of current assets at the beginning of a new re-equipment program; later, the current assets expended to initiate the program are returned in the form of rents and other payments.

5. The Conference Report, H.R.Rep. No. 94–781, 94th Cong.2d Sess., p. 187, characterized § 208(d)(3) as authorizing "as part of the final system plan, certain limited categories of amendatory designations to permit the efficient implementation of the plan and to further the goals of the plan."

Excelsior had accumulated cash and short-term investments of $2,773,500 as of March 1, 1976. The accumulation was due to two principal causes, the failure to pay any dividends since the Penn Central bankruptcy in 1970, and Penn Central's failure to undertake any new equipment program in 1975.[6] Although the parties are in disagreement as to some of the facts, there seems to be little doubt that ConRail will require for former Penn Central operations a number of vehicles equal to or, more likely, considerably exceeding those proposed by the Penn Central Trustees, and that a reduction in its cash and short-term investments from $2,773,500 to $377,000 on March 31, 1976, primarily as a result of payment of the proposed dividend would at the very least require a substantial delay of any new program until further cash reserves had accumulated. Similarly, conveyance of the Conshohocken facility, which is essential to Excelsior's present operations, would admittedly impair their efficiency; while the effect of this would be mitigated by a lease on reasonable terms, payment of the rent would be a further drain on Excelsior's working capital.

■ All this seems to come reasonably within the meaning of the final sentence of paragraph 4 and the intent of Congress in allowing USRA to make additional designations. Since paragraph 4 is contained in the very notice designating "All of the PCTC's and American Contract Company's right, title and interest in Excelsior Truck Leasing Company, including its common stock," the two provisions must be read together. Although we have rejected the notion that, by enacting § 208(d)(3), Congress allowed USRA to expand all its previous stock designations, we see no reason why, in making new ones, USRA could not impose the gloss that it did in paragraph 4 of the February 25 notice, rather than having to repeat those words in every case. In contrast to the Canada Southern situation, ConRail is not asking that assets be devoted to a pur-

pose for which they had never been devoted in the past; it is seeking that they be maintained as they were at the time of designation. But for the accidental one-year lapse in equipment acquisitions programs, most of the current assets proposed to be paid as a dividend would have been effectively committed to or indeed already expended in a program. The extract we have quoted from FSP, Vol. I, p. 253, excepts conveyance of items that "already have been, or should have been, set aside for purposes the transferees may be required to carry out." The Penn Central Trustees do not seriously assert that, in light of the additional February 25 designation with respect to Excelsior, they could have stripped the company of everything. Their contention is rather that the action they propose will not have that effect. Without going into detail it seems evident to us that for a company requiring large amounts of current assets to continue its business, depletion of these to $377,000 is, in effect, a withdrawal from normal operations—even though cash accruals from previous business may ultimately permit their resumption. Insofar as there is conflict in the evidence on this issue, we find ConRail's to be more persuasive. We hold that, as to Excelsior, ConRail is entitled to the relief sought.

We, therefore, dismiss the complaint as to the proposed declaration and payment of an extraordinary dividend by Canada Southern and grant the relief requested as to the proposed declaration and payment of an extraordinary dividend and the conveyance of the Conshohocken property by Excelsior. No costs. If the parties consider any further order to be needed and cannot agree upon its form, this may be settled on three days' notice.

---

**6.** This seems to have been due to difficulties in coordination between the Penn Central Trustees and ConRail. The reorganization court set for hearing on November 13, 1975, a proposal to lease to the Trustees 596 vehicles having a capital cost exceeding $8 million. After several postponements, the hearing was cancelled on January 19, 1976.